Approved: _____
　　　　　　Peter J. Davis / Jun Xiang
　　　　　　Assistant United States Attorneys

Before:　　HONORABLE STEWART D. AARON
　　　　　　United States Magistrate Judge　　**20 MAG 8994**
　　　　　　Southern District of New York

- - - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　　　:
UNITED STATES OF AMERICA　　　　　　:　　**COMPLAINT**
　　　　　　　　　　　　　　　　　　　:
　　　- v. -　　　　　　　　　　　　 :　　Violation of
　　　　　　　　　　　　　　　　　　　:　　21 U.S.C. § 846
VICTOR CASTRO, and　　　　　　　　 　:
EDUARDO FERNANDEZ,　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　:　　COUNTY OF OFFENSE:
　　　　　　　Defendants.　　　　　　 :　　NEW YORK
　　　　　　　　　　　　　　　　　　　:
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

　　　CHRISTIAN GARCIA, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

COUNT ONE
(Narcotics Conspiracy)

　　　1.　In or about August 2020, in the Southern District of New York and elsewhere, VICTOR CASTRO and EDUARDO FERNANDEZ, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

　　　2.　It was a part and an object of the conspiracy that VICTOR CASTRO and EDUARDO FERNANDEZ, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

　　　3.　The controlled substance that VICTOR CASTRO and EDUARDO FERNANDEZ, the defendants, conspired to distribute and possess with intent to distribute was 5 kilograms and more of

mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

4. I am a Special Agent with the DEA and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, and my conversations with law enforcement officers, law enforcement employees, and witnesses, as well as a review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. Based on my participation in this investigation, my review of documents, my participation in surveillance, and my conversations with other law enforcement officers, I have learned, in substance and in part, the following:

a. Beginning on or about August 16, 2020, through on or about August 21, 2020, a confidential source working with law enforcement ("CS-1")[1] communicated with a co-conspirator of the defendants not named herein ("CC-1") regarding the purchase of cocaine by CC-1 from CS-1. Many of these calls were recorded by CS-1.

b. Based on my review of those recordings, which were in Spanish,[2] and my discussions with CS-1, I have learned, among other things, the following:

i. CS-1 informed CC-1, in substance and in part, that CS-1 had an operation that flew cocaine from Bolivia to

---

[1] CS-1 has been providing information to the DEA since in or about 2006. CS-1 was previously arrested for a narcotics offense, but the case was subsequently dismissed. CS-1 is providing information to law enforcement in exchange for financial benefits. Information provided by CS-1 has been found reliable and corroborated by, among other things, phone records and electronic evidence, and has led to multiple seizures of narcotics.

[2] I am fluent in Spanish.

different cities in the United States, and that after conducting an initial cocaine transaction with CC-1 in New York, CS-1 would be willing to fly large kilogram quantities of cocaine to Boston, Massachusetts, in order to supply CC-1. CC-1 stated, in substance and in part, that CC-1 had the ability to distribute approximately 12 to 20 kilograms of cocaine per week.

    ii. CS-1 and CC-1, in substance and in part, negotiated a cocaine transaction in which CC-1 and his associates would purchase approximately seven kilograms of cocaine for approximately $30,000 per kilogram. Based on my training and experience, I know that the per-kilogram price that CC-1 agreed to pay to CS-1 is consistent with street prices for wholesale, bulk quantities of cocaine supplied for further distribution.

    iii. CC-1 also informed CS-1, in substance in part, that his associates would provide the money to purchase the cocaine from CS-1 and that CC-1 had traveled to meet the associates and counted the money himself. CC-1 told CS-1, in substance and in part, that the vehicle with the money for the transaction would leave Massachusetts to travel to New York on or about August 21, 2020, at approximately 9 or 10 a.m. CC-1 and CS-1 also agreed to meet in Manhattan, New York on August 21, 2020.

  c. On or about August 21, 2020, at approximately 11:30 a.m., CC-1 met with CS-1 in Manhattan. This meeting was recorded. Based on my review of that recording and my discussions with CS-1, I have learned, among other things, the following:

    i. CC-1 informed CS-1, in substance and in part, that his associates who would supply the money for the transaction were excited that the cocaine came from Bolivia because Bolivia has high-quality cocaine. CC-1 also told CS-1, in substance and in part, that CS-1 should bring a pen to check that the currency was authentic. Based on my training and experience, I have learned that by striking a pen across a stack of money, a person can check to see if any fake bills are included in the stack. CC-1 further stated, in substance and in part, that CC-1 could distribute 15 kilograms of cocaine per day.

    ii. During this meeting, CC-1 received a phone call and, in substance and in part, asked the person on the other end of the call where that person was located. When the call ended, CC-1 informed CS-1, in substance and in part, that his associates and the money for the cocaine were approximately two hours away. CC-1 asked CS-1, in substance and in part, where he should direct the vehicle with the money to go in order to execute the transaction.

iii. CC-1 informed CS-1, in substance and in part, that during the upcoming cocaine transaction, CC-1 and CS-1 would look at the money, while CC-1's associates would inspect the cocaine. CC-1 said, in substance and in part, that he would receive a $35,000 commission for arranging the transaction between CS-1 and his associates who were bringing the money to purchase the cocaine.

iv. CS-1 sent CC-1 a text message with an address ("Address-1") in Manhattan where the narcotics transaction would take place.

d. Later that day, on or about August 21, 2020, at approximately 2:00 p.m., law enforcement surveilled Address-1 and observed CC-1, whom law enforcement recognized from their surveillance of the meeting earlier in the day between CS-1 and CC-1, in the vicinity of Address-1. At approximately 2:20 p.m., law enforcement observed CC-1 meet with CS-1 in the vicinity of Address-1. CS-1 recorded this meeting. Based on my review of that recording, my participation in surveillance, my discussions with other law enforcement officers, and my discussions with CS-1, I have learned, among other things, the following:

i. At approximately 2:45 p.m., a gray Cadillac sedan with a Massachusetts license plate ("Vehicle-1") arrived in the vicinity of Address-1 (as set forth above, CC-1 had informed CS-1 that CC-1's associates would travel from Massachusetts to New York to conduct the cocaine transaction). Law enforcement observed the passenger of Vehicle-1, who was later identified as VICTOR CASTRO, the defendant, exit Vehicle-1 and walk toward CC-1 and CS-1. CS-1, CC-1, and CASTRO then had a discussion. CASTRO informed CS-1, in substance and in part, that he was there to "work" and he wanted to look at the "product."[3] CASTRO also stated, in substance and in part, that the money was in another car (*i.e.*, not Vehicle-1). CS-1 told CC-1, in substance and in part, that this was not what CC-1 and CS-1 had agreed to previously.

ii. CASTRO then returned to Vehicle-1 and entered the front passenger seat. Vehicle-1 drove around the block and returned to the vicinity of Address-1. CASTRO then exited Vehicle-1 and spoke to CS-1. CASTRO asked, in substance and in

---

[3] Based on my training and experience, I know that narcotics traffickers commonly use the code word "work" to refer to conducting narcotics transactions and that "product" and "material" are code words commonly used by narcotics traffickers to refer to narcotics.

4

part, to inspect the cocaine. CASTRO then approached the driver's side window of Vehicle-1 and spoke to the driver of Vehicle-1, who was later identified as EDUARDO FERNANDEZ, the defendant.

    iii. CS-1 and CC-1 approached the passenger side of Vehicle-1 and spoke with FERNANDEZ. FERNANDEZ stated, in substance and in part, that he wanted to inspect the "material" (*i.e.*, cocaine), and CC-1 stated, in substance and in part, that he would go with FERNANDEZ to inspect the cocaine. FERNANDEZ then asked, in substance and in part, who would stay with Vehicle-1 while they inspected the cocaine, and CC-1 said that CASTRO could stay with Vehicle-1. CS-1 then stated, in substance and in part, that nobody would go inspect the cocaine until CS-1 saw the money. FERNANDEZ responded, in substance and in part, that he was not happy with CS-1 not allowing them to inspect the cocaine. CS-1 then told CC-1, in substance and in part, that CS-1 was willing to walk away from the deal. FERNANDEZ then asked CS-1, in substance and in part, whether CS-1 wanted to see the money or simply count the money. CS-1 said, in substance and in part, that CS-1 needed only to verify that the money was authentic. CASTRO then stated, in substance and in part, that the money was located in a secret compartment inside Vehicle-1 (the "Trap").[4]

    iv. FERNANDEZ and CASTRO, who were now in Vehicle-1, drove Vehicle-1 around the block near Address-1 while CS-1 and CC-1 remained in the vicinity of Address-1. Soon thereafter, FERNANDEZ and CASTRO returned in Vehicle-1 and parked near CC-1 and CS-1.

    v. Law enforcement then observed CS-1 as he looked inside the passenger side door of Vehicle-1. CS-1 observed money inside of a black and blue backpack ("Backpack-1") on the floor between CASTRO's legs in Vehicle-1. CS-1 removed one vacuum-sealed package of money out of Backpack-1 and verified that the currency was authentic. At that point, CS-1 called law enforcement and gave the signal that he had verified the money.

    vi. Law enforcement then began to approach Vehicle-1, to arrest the participants in the cocaine transaction. As law enforcement approached, Vehicle-1 began driving away. Law enforcement surveilled and followed Vehicle-1 as it drove for a

---

[4] Based on my training and experience, I have learned that narcotics traffickers commonly have secret compartments inside their vehicles to hold, conceal, and transport narcotics and narcotics proceeds, and that these compartments are commonly referred to as "traps."

5

few blocks, and law enforcement then stopped Vehicle-1. CC-1, CASTRO, and FERNANDEZ were placed under arrest.[5] There were no other occupants of the vehicle.

        vii.    Subsequently, a trained narcotics-detection canine (the "K-9") was exposed to Vehicle-1 and alerted to the area outside of the passenger door of Vehicle-1. Law enforcement conducted a search of Vehicle-1. The K-9 also alerted to the area inside of Vehicle-1 near the glove compartment on the front passenger side. Through my training and experience, I know that the K-9 alerts when he detects the presence of narcotics. Law enforcement searched the area near the glove compartment, and discovered a hidden compartment — which I believe, based on my training, experience, and participation in this investigation, to be the hidden compartment referred to by CASTRO (*i.e.*, the Trap).

        viii.    Law enforcement recovered approximately $250,000 in cash from inside the Trap. The money was contained in vacuum-sealed packaging, in a manner consistent, based on my training and experience, with how narcotics traffickers commonly bundle and package narcotics proceeds and currency used to conduct drug deals. A photo of the cash seized from the Trap is below:



        e.    Law enforcement also recovered a vacuum sealer and Backpack-1 from Vehicle-1.

        6.    Based on my participation in this investigation, including my discussions with other law enforcement officers, I have learned, in substance and in part, the following:

        a.    Upon being arrested, VICTOR CASTRO, the defendant, spontaneously stated to law enforcement, in substance and in part, that he had told his associates that he knew CS-1 was

---

[5] CC-1 was subsequently released by law enforcement, and has not been charged at this time.

an "undercover" and to leave him (*i.e.*, CS-1) alone when they circled the block.

    WHEREFORE, the deponent respectfully requests that VICTOR CASTRO and EDUARDO FERNANDEZ, the defendants, be imprisoned or bailed, as the case may be.

/s/ Christian Garcia, by SDA
_____
CHRISTIAN GARCIA
Special Agent
Drug Enforcement Administration

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 4.1 and 41(d)(3), this
23rd day of August, 2020

_____
THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK